UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Criminal Case No.  03-cr-00232-RPM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

2.     THOMAS ALAN BOYD,
3.     JACK O. GRACE, JR.,
4.     GLENN M. GALLANT,
5.     DOUGLAS R. BAETZ,

        Defendants.

## CALCULATION OF SENTENCING GUIDELINES

After receipt of the mandate from the Tenth Circuit Court of Appeals pursuant to the opinion reported at 537 F.3d 1202 (10th Cir. 2008) and the directions to this Court for re-sentencing the defendants, the government submitted a proffer of evidence in support of its proposal to calculate the amount of the loss to BestBank from the criminal fraud of the defendants in the operation of the sub-prime credit card program marketed as the All Around Travel Club.  That proffer was the focus of an evidentiary hearing held on October 26 -28, 2009.

The government's position is that a reasonable estimate of the bank's loss is the measurement of the net balances of the cardholder accounts as of January 31 and July 23, 1998 for those accounts that never received a cardholder payment or a credit paid by Century.  The gross loss numbers are $115,854,827 at July 23, 1998 and $74,146,157 at January 31, 1998.  The bank officer defendants are considered to be responsible only for the difference of $41,708,670, based on the Court's findings as to when they joined the conspiracy and participated in the fraud.

After crediting the amount of the participation by Century and the reserve account balance on the date of closing, the estimated loss caused by defendants Baetz and Gallant is estimated to be $61,135,591 and that caused by the defendants Boyd and Grace is $16,637,725.

The underlying basis for this approach is the work done by Jeffrey Opp, who was first retained by the FDIC in September, 1998 to develop a claim for damages asserted by the FDIC in civil litigation against these defendants in *FDIC v. Matter, et al*, Civil Action 98-M-2374, which has not yet been resolved.

The methodology used by Opp is described in his expert witness report of June 3, 2004, and his trial testimony. He was cross-examined extensively on his work. Opp created a new database from the records of the loan processors, FDR and FICI, and verified it by reconciling with the flow of funds between BestBank and Century shown in daily settlement statements and bank account statements. Over 6,000,000 transactions were recorded. He then conducted an analysis through data queries he constructed.

By this method he separated the AATC accounts into four categories: (1) those receiving only AATC credits, (2) those receiving cardholder payments and AATC credits, (3) those receiving only cardholder payments and (4) those receiving neither cardholder payments nor AATC credits. Categories #1 and #4 combined were interpreted as non-performing accounts. The dollar value assigned to those accounts is the value carried on BestBank's books on the date of the bank's closure, July 23, 1998.

The defendants' criticisms of Opp's analysis are based on the view that the question to be answered is the actual value of the AATC loan portfolio. Opp's analysis fails to account for the fact that there were post closure payments on performing accounts, that Century was offering to fund fulfillment of AATC packages and that the FDIC lost the value that could have been

2

obtained by proper servicing of the accounts and marketing a sale of the portfolio.

      The evidence presented at the evidentiary hearing provides some support for a finding that the FDIC as receiver mishandled the bank's assets. That fact may be relevant to determining damages in the civil action. It is not relevant to the calculation of loss under U.S.S.G. §2F1.1. Application Note 7 cross references the Commentary to §2B1.1 for theft cases defining loss as the value of money unlawfully taken. In this case that is the amount of funds going into the Century operating account at BestBank when new accounts were opened and then withdrawn by Century.

      The marketing agreement with Century required the payment of $20 with the application for an AATC membership, a membership fee of $498 and an annual fee of $45. Minimum monthly payments of $20 were required to keep the account open. When those payments were not made but were recorded as accounts receivable on the bank's records, most of the $543 became available to Century in its operating account and when Century drew on the operating account the result was a theft from the bank.

      Opp's analysis is not precise. It amounts to an estimate of the amount of money taken from the bank by Century through the fraudulent conduct of the defendants.

      The bank officer defendants, Boyd and Grace, are not responsible for the unlawful taking before they knowingly participated in the conspiracy in January, 1998. Accordingly, the loss attributable to their participation is that from transfers made after that month.

      It may be said that although the bank officers knew that the bank was losing money because of the falsification of the performance of cardholder accounts, their actions were motivated by a desire to keep the bank open by inflating the value of the assets to mislead the

regulators. A case could be made that the FDIC's action in causing the bank to be closed by the state commissioner was ill-advised and that other measures may have been taken to avoid loss and infuse sufficient capital to keep the bank open. That too may be relevant to the question of consequential damages in the civil case. It may also be a factor in exercising discretion in determining sentences under 18 U.S.C. § 3553. It is not relevant to the determination of loss under the sentencing guidelines.

The defendants argue that a large number of new accounts opened in the last three months of operation of the bank and that Opp's analysis failed to recognize that payments on many of these accounts were not due under the billing cycle. The initial payment of $20 was due at the opening of the account and there is no evidence of those payments. A fair inference from the evidence at trial is that this large increase in new accounts was not the result of legitimate marketing but was the posting of accounts to inflate the value of receivables after the regulators were pressing for more information in March, 1998.

Based on Opp's analysis the loss calculation is as follows:

<u>Gallant & Baetz</u>: June 1, 1996 through July 23, 1998

| | |
|---|---:|
| Net portfolio balance of non-performing accounts on 7/23/98 | $115,854,827 |
| Minus Particiaption on 7/23/98 | -$46,530,245 |
| Minus Reserve on 7/23/98 | <u>-$8,188,991</u> |
| "Loss" | ($61,135,591) |

<u>Boyd & Grace</u>: February 1, 1998 through July 23, 1998

| | |
|---|---:|
| Net portfolio of non-performing accounts on 1/31/98 | $115,854,827 |

| | |
|---|---|
| Minus net portfolio balance of the non-performing accounts on 1/31/98 | -$74,146,157 |
| Change in net portfolio balance of the non-performing accounts | $41,708,670 |
| Participation 7/23/98 | $46,530,245 |
| Minus Participation 1/31/98 | -$23,365,904 |
| Change in Participation | $23,164,341 |
| Reserve 7/23/98 | $8,188,991 |
| Minus Reserve 1/31/98 | -$6,282,387 |
| Change in Reserve | $1,906,604 |
| Change in Portfolio | $41,708,670 |
| Minus Change in Participation | -$23,164,641 |
| Minus Change in Reserve | -$1,906,604 |
| "Loss" | ($16,637,725) |

Accordingly, under § 2F1.1(b) the base offense level 6 is increased by 17 for defendants Gallant and Baetz and 15 for defendants Boyd and Grace.

The government seeks to increase the amount of loss under §2F1.1 to the maximum of an 18 level increase for Baetz and Gallant by adding $8,300,000 as "intended loss" for the wire fraud on the attempted sale of Mattar's stock to Farrar in Count 57; $115,854,827 as the intended loss from the attempted sale of credit card receivables through a proposed brokerage agreement with David Taffet of Infusion Capital in counts 68-70 and 72-73; and $23,000,000 as intended loss for the proposed sale of Mattar's stock in BestBank to Cereberus partners for wire fraud in counts 58-60 and 62.

These intended loss calculations are not supported by the evidence. While Baetz and Gallant were found guilty of wire fraud in the false statements made during the course of negotiations for the sale of Mattar's stock, the negotiations with Farrar and Cereberus never

reached the point where any price or terms were agreed.  Indeed, Mattar was willing to sell for $10,000,000 just to get out of the business.  Unlike the actual loss computations based on the non-performing AATC accounts, a loss calculation for the wire fraud accounts involving Farrar and Cereberus would require a determination of the value of the bank stock which depends on the value of all the bank's assets offset by its liabilities.  As to the proposed marketing arrangement with Taffet, the intended loss would be the amount which Infusion Capital might earn in a successful sale of the loan portfolio.  There is no evidentiary basis for a reasonable estimate of that amount.

The government seeks to add $23,000,000 as the "intended loss" for defendants Boyd and Grace for wire fraud counts as to Cereberus in counts 58, 59, 60 and 62 through 64 making the total loss $39,637,725 requiring the addition of 1 level for them for a total level of 16.  As was true with respect to Baetz and Gallant, there is no evidentiary basis for finding the value of Mattar's stock and the sale price was never determined.

It may be suggested that actual losses could be determined by the amounts expended in investigating these proposals.  Only conclusory statements have been presented and they are not sufficient to support a guidelines finding of actual loss.

Because the offenses involved more than minimum planning, each defendant's offense level is increased by 2 under §2F1.1(b)(2).

Under §2F1.1(b)(6), a 4 level increase is required if the offense (A) substantially jeopardizes the safety and soundness of a financial institution or (B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense.  Both of these requirements are met by the trial evidence as to defendants Baetz, Gallant and

Boyd. Grace did not derive more than $1,000,000 in gross receipts from the offense but his conduct in misrepresenting the value of the bank's assets in the call reports and disguising the performance of the AATC accounts directly jeopardized the safety and soundness of BestBank with the ultimate result of its closure. The 4 level increase applies to Grace.

Under § 3B1.1(a), an enhancement of 4 levels is required if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive". The Court of Appeals has directed that to apply this enhancement the Court must find that the defendant supervised at least one person who was a criminally responsible participant. The trial record supports a finding that Gallant and Baetz were organizers and leaders of extensive criminal activity that involved five or more participants and supervised Michael Mansueto, the president of AATC, Keith "Dusty" Durham who knowingly applied credits to accounts without cardholder payments and Melody Long, the controller who negotiated the transfers from Century operating account in furtherance of the scheme to defraud the bank. Boyd, as president of the bank, was a leader and organizer of extensive criminal activity that involved five or more participants and supervised the co-defendant Grace as well as Grace's subordinates, Robert Ogburn, Jack Hitt and John Schmalzer.

Grace, as chief financial officer and director, was a manager and supervisor (but not an organizer or leader) of extensive criminal activity that involved five or more participants and was responsible for Schmalzer who, as the risk manager, knowingly lied and withheld information from the bank's board of directors since January, 1998, with Grace's knowledge and approval. Accordingly, Grace's offense level is increased by three levels under §3B1.1(b).

The abuse of trust 2 level enhancement required by § 3B1.3 applies to Boyd and Grace

7

because of their duties to the bank as officers. The bank being regulated and insured by the FDIC makes their positions subject to a level of public trust which they dishonored and abused.

The adjusted offense level for Baetz, Gallant and Boyd is 33 and the adjusted offense level for Grace is 32.

The Criminal History Category for each defendant is I.

Accordingly, the Sentencing Guideline range for grouped offenses are as follows:

| | |
|---|---|
| Glenn M. Gallant | 135 - 168 months |
| Douglas R. Baetz | 135 - 168 months |
| Thomas Alan Boyd | 135 - 168 months |
| Jack O. Grace, Jr. | 121 - 151 months |

## RESTITUTION

The Court of Appeals in its opinion determined that David Taffet is a victim of the wire fraud by Baetz and Gallant when they hired him to sell the credit card portfolio by misrepresenting its value as charged in counts 55 - 60 and that the expenses he incurred in reliance on those misrepresentations should be the measure of his loss under the Mandatory Victims Restoration Act (MVRA), 18 U.S.C. §3663A. The amount of that loss submitted by the government is $12,500 and there is no objection to that amount.

The Court of Appeals also found that Cereberus Partners is the victim of the wire fraud counts charging the misrepresentations made to it during the negotiations for the purchase of a percentage of Mattar's BestBank stock. The expenses of conducting due diligence investigation is presumed to be the loss sustained and the government contends that amount is $1,360,239 after deducting $60,000 paid to Cereberus Partners in settlement of a civil action. All four defendants were found guilty on wire fraud counts relating to this matter. The order for

restitution is limited to the actual loss. The figure claimed by the government is based on an affidavit submitted to the probation office by Seth Plattus as chief administrative officer of Cereberus Capital Management, L.P. Plattus provided no evidentiary support for his contention that $1 million represents lost employee time and related expenses, $297,704.96 for attorney time and other charges paid to the Schulte law firm and $25,000 for other law firm attorneys. An additional payment of $97,535 was purportedly paid to KPMG Peat Marwick.

The absence of supporting documents and the failure to identify what the services were, particularly for attorneys and accountants, prevents this Court from accepting that affidavit as fair value. Presumably much of the expense related to how to structure the sale with maximum advantage to Cereberus rather than investigating the credibility of the representations made by the defendants. The amount to be awarded must be actual, not estimated loss and it must be directly caused by the criminal conduct of the defendants. Given the amount claimed, the nature of the claim and the complexity of the matter, it is apparent that an evidentiary hearing equivalent to a civil trial would be necessary to determine an award. Further delay of these proceedings for sentencing is not justified by any need to provide restitution to a potential investor with the sophistication and expertise of Cereberus Partners. Accordingly, under the authority granted by §3663A(c)(3)(B), no restitution will be ordered.

This complexity exception is also urged by the defendants to avoid payment of restitution to the FDIC. In their filed papers and at the recent hearing, the defendants submitted evidence of the failures of the FDIC in post closure management of the bank's assets. That evidence would be relevant if the issue were loss to FDIC as a government agency. That is not the question. The FDIC's claim is that of BestBank as the direct victim of the defendants' fraud. Accordingly, the

government is claiming that the same estimate of loss used in calculating the guidelines base offense level should be used to measure the amount of restitution. Recognizing the difference between the amount of actual loss under MVRA and the reasonable estimate of loss for the guidelines, the controlling issue is whether the evidence supports the government's contention that the Opp calculations provide an estimate that is lower than the actual loss sustained by the bank. The preponderance of the evidence from trial supports an affirmative answer. Accordingly, restitution to the FDIC should be awarded to the FDIC as receiver for the bank in the same amounts as that found to be the amount of loss under U.S.S.G. §2F1.1(b).

It is,

ORDERED that objections under Rule 32(f) will be filed on or before November 20, 2009.

DATED: November 5th, 2009

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge